IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

**FRANCIS EUGENE WHITE**                                                         **PLAINTIFF**

**V.**                                                   **CASE NO 3:10-CV-612-TS-MTP**

**WEXFORD HEALTH SOURCES, INC.; et al.**                        **DEFENDANTS**

## REPORT AND RECOMMENDATION

Before the Court are the Defendants' motions for summary judgment [73][78] and for judgment on the pleadings [61]. Having considered the motions, case record, and applicable law, the undersigned is of the opinion that a judgment should be entered in favor of the Defendants and that this case should be dismissed for the reasons provided below.[1]

### FACTUAL BACKGROUND

Francis Eugene White, proceeding *pro se* and *in forma pauperis*, filed his 42 U.S.C. § 1983 complaint in this Court on October 26, 2010. White's claims arise from events which occurred while he was a post-conviction inmate at Central Mississippi Correctional Facility ("CMCF") in Pearl, Mississippi. The Defendants in this lawsuit are Wexford Health Sources, Inc., Christopher Epps, Dr. Joseph Blackston, Dr. Kentrell Liddell, Dr. Rochel Walker, Dr. Nikesia Beamon-Webb, and Dr. Daisy Thomas.[2]

---

[1]The Plaintiff has not responded to any of the pending motions and the time to do so has long since expired.

[2]In addition, White named the Mississippi Department of Corrections ("MDOC"), Margaret Bingham, and Unknown Manufacture of Stint as defendants when he filed this lawsuit. By Order dated January 7, 2011, the Court dismissed the Department of Corrections and Unknown Manufacturer from the lawsuit. *See* Doc. [11]. At the omnibus hearing on May 11, 2011, White voluntarily dismissed his claims against Bingham. *See* Interim Omnibus Order [33].

Through his complaint and as clarified by his testimony at the *Spears*[3] hearing, White asserts that the Defendants were deliberately indifferent to his medical needs. White had a heart attack on April 16, 2009, while incarcerated at CMCF and was sent to the Central Mississippi Medical Center to have heart surgery. The cardiologist performing the surgery, Michael Payment, placed a stent in the Plaintiff's blocked artery. Dr. Daisy Thomas treated White after the surgery.

On April 21, 2010, Dr. Payment performed a heart catheterization on the Plaintiff, which revealed that two of the grafts from the surgery were occluded. However, Dr. Payment concluded that additional surgery was unnecessary and decided that White's condition could be managed through the use of medications. White claims that as a result of the occluded grafts and further blockage, he suffers from permanent damage to his heart and brain.

Although Dr. Thomas treated him after his surgery, White asserts that she was deliberately indifferent to his medical needs because she examined him 6-8 times and indicated that nothing was wrong with his heart. As to the other defendants, White alleges that he complained about his heart problems from 2005 to 2009, but that physicians working at CMCF failed to properly treat him. White alleges that Dr. Kentrell Liddell is the Chief MDOC doctor and is responsible for him not being treated by an outside physician. White admits he never had any contact with Dr. Liddell and that she never treated him. *See* Omnibus Transcript 16:16-17:1.

Drs. Rochel Walker, Nikesia Beamon-Webb, and Joseph Blackston examined White at

---

[3] *Spears v. McCotter*, 766 F.2d 179 (5th Cir.1985) (testimony offered at an omnibus hearing supercede allegations made in *pro se* complaint), overruled on other grounds, *Neitzke v. Williams*, 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989).

various times from 2005 to 2009. His claims against these defendants are based on their inability to find anything wrong with him despite his complaints about heart problems. White claims that after he met Dr. Blackson in 2005, he requested to be treated by a cardiologist in Jackson, Mississippi, but that Dr. Blackson chose to treat him at the CMCF clinic.[4] *See* Complaint [1] at 5. White asserts that Dr. Walker was in charge after Dr. Blackston left and that she did nothing to treat his alleged heart problems. Dr. Walker treated the Plaintiff approximately 12 times from January 25, 2005 until July 25, 2008. *See* Affidavit [73-2] at 2. Dr. Webb treated him 10 times from July 12, 2006 until January 29, 2009. *See* Affidavit [73-3] at 2. White argues that although Dr. Webb treated him for lung problems, the doctor would not treat him for heart problems. *See* Complaint [1] and Omnibus Order [33].

In addition, White is suing Wexford Health Sources, who allegedly employs the doctor defendants,[5] based on a contract Wexford entered into with the State of Mississippi to supply medical care to MDOC inmates. He names Christopher Epps as a defendant because of Epps' employment as Commissioner of the MDOC. The Plaintiff seeks compensatory and punitive damages.

On May 22, 2012, Dr. Blackston filed a Motion for Judgment on the Pleadings [61],

---

[4]White testified at the omnibus hearing that he "had quadruple bypass surgery in 1994, and...in 2004, [he] started having a lot of trouble again..." Transcript Exhibit [73-5] at 11:2-5. He claims that he complained about his heart trouble, but the doctors at CMCF would not send him to an outside physician. He testified that his sole reason for suing Dr. Blackston was because the doctor did not send him to a cardiologist. *Id*. at 12:24-13:4. He claims that Dr. Blackston's failure to send him to a cardiologist in 2005 caused him to suffer a heart attack in 2009. *Id*. at 13:5-10.

[5]Dr. Blackston was never employed by Wexford Health Sources, Inc. *See* Omnibus Transcript [73-5] at 13:23-25. At the time of the events alleged in this lawsuit, the other doctor defendants were employed by Wexford Health Sources, Inc.

asserting that White fails to state a claim pursuant to Fed. R. Civ. P. 12(c) and, alternatively, that his claims are time-barred. On July 16, 2012, Wexford Health Sources and Drs. Thomas, Walker, and Webb filed a Motion for Summary Judgment [73], asserting that they were not deliberately indifferent to the Plaintiff's medical needs. On August 15, 2012, Dr. Liddell also filed a Motion for Summary Judgment [78], arguing that he should be granted judgment as a matter of law based on his Eleventh Amendment and qualified immunities.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009) (quoting *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000)). The Court must consider the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Id.* The party seeking summary judgment cannot rely on metaphysical doubt, conclusive allegations, or unsubstantiated assertions but instead must show that there is an actual controversy warranting trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).

Like motions for summary judgment, motions for judgment on the pleadings must be viewed in the light most favorable to the nonmoving party. *Jebaco, Inc. v. Harrah's Operating Co., Inc.,* 587 F.3d 314, 318 (5th Cir. 2009). The court should only grant a motion under Fed. R. Civ. P. 12(c) if the complaint fails to provide "enough facts to state a claim to relief that is plausible on its face." *Id*. (quoting *Does v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).

4

Thus, the core inquiry is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *Doe,* 528 F.3d at 418. "[T]he complaint must allege 'more than labels and conclusions,' 'a formulaic recitation of the elements of a cause of action will not do,' and 'factual allegations must be enough to raise a right to relief above the speculative level.'" *Jebaco,* 587 F.3d at 318 (quoting *Bell v. Twombly,* 550 U.S. 544, 444, 127 S.Ct. 1955, 1965, 167 L.Ed. 2d 929 (2007)).

In this lawsuit, the Plaintiff asserts that the Defendants were deliberately indifferent to his heart problems. Prison official violate the Eighth Amendment's prohibition against cruel and unusual punishment when show deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976). "[A] prison official cannot be found liable under the Eighth Amendment...unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed. 2d 811 (1970). The official must have known that an inmate faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Id*. at 847. If the risk is obvious, the official's knowledge of that risk may be inferred. *Id.* at 837; *Easter v. Powell,* 467 F.3d 459, 463 (5th Cir. 2006).

A prisoner's mere disagreement with medical treatment does not state a valid claim for deliberate indifference. *Castilla v. July*, 470 Fed. Appx. 358, 359 (5th Cir. 2012) (citing *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)). Rather, the prisoner-plaintiff must demonstrate that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985).

a. Dr. Joseph Blackston

White argues that Dr. Blackston's refusal to refer him to an outside physician amounts to deliberate indifference in violation of his Eighth Amendment rights. However, he has not alleged sufficient facts to support a valid deliberate indifference claim against Dr. Blackston. The only fact the Plaintiff asserts in support of his claim is that Dr. Blackston decided to treat him instead of sending him to another physician in 2005. He claims that Dr. Blackston's failure to send him to an outside physician is the reason why he suffered a heart attack in 2009. White argues that Dr. Blackston should have known he had heart problems or faced a substantial risk of further heart problems based on his medical history.

However, the Plaintiff has not established that he faced a substantial risk of harm during the time he was being treated by Dr. Blackston or that the doctor failed to take reasonable steps to prevent any such harm from occurring. White had a heart attack in 2009, approximately four years after Dr. Blackston chose not to send him to another doctor. *See* Doc. [75] at 100-104; Doc. [75-3] at 102. The Plaintiff has not specified how the treatment he received from Dr. Blackston was substandard, much less shown that Dr. Blackston was deliberately indifferent to his medical needs. He only alleges that Dr. Blackston should have known in 2005 that his medical conditions would have worsened and caused him to have a heart attack four years later.

Having considered the facts and drawn all reasonable assumptions in the Plaintiff's favor, the undersigned opines that the complaint does not state a sufficient basis for relief under § 1983 as it relates to Dr. Blackston. White alleges that Dr. Blackston should have sent him to an outside physician rather than choosing to treat him. An inmate's mere disagreement with medical treatment is not enough to state a claim for deliberate indifference. Judgment on the

pleadings pursuant to Rule 12(c) is proper. Further, assuming the complaint had stated a claim, Dr. Blackston is nevertheless entitled to summary judgment because the Plaintiff has not shown that Dr. Blackston was deliberately indifferent to his medical needs in any way. The claims against this Defendant should be dismissed.

b.      Drs. Rochel Walker, Nikesia Beamon-Webb, and Daisy Thomas

Drs. Thomas, Walker, and Webb argue that they should be granted summary judgment because the Plaintiff cannot establish a causal link between his alleged injuries and their alleged wrongful conduct. These Defendants also point out that White has no expert testimony or medical records to support his argument that their alleged deliberate indifference caused his medical conditions to worsen.

Dr. Walker saw White from January 25, 2005 to July 25, 2008, while he was incarcerated at CMCF.[6] Walker Affidavit [73-2] at 2. During that period, Dr. Walker treated White on twelve occasions, only one of which was related to a sick call request concerning White's heart problems: December 14, 2005.[7] During that visit, White complained of numbness to his feet, dizziness, urinary problems, and chest pains. Doc. [75] at 87. Dr. Walker evaluated White and

---

[6]White was 71 years old and suffered from hypertension and coronary artery disease when he started seeing Dr. Walker. Walker Affidavit [73-2] at 2.

[7]Three of the twelve doctor visits were regularly scheduled chronic care evaluations of White's known cardiac condition. The eight other doctor visits were in response to White's sick call requests concerning medical issues unrelated to his heart problems. Walker Affidavit [73-2] at 2. Dr. Walker saw White on January 25, 2005; March 8, 2005; October 11, 2005; November 28, 2005; December 29, 2005; February 1, 2006; March 14, 2006; and July 25, 2008. *Id.* at 3. During each of these visits, Dr. Walker performed a physical examination on the Plaintiff and found that additional diagnostic testing of his cardiac condition and referral to an outside medical provider were unnecessary. *Id*. at 5. According to Dr. Walker, the Plaintiff only "presented complaints or symptoms that potentially related to his cardiac condition" to her on one occasion. *Id*. at 3.

7

determined that his "heart tones were audible with a regular rate and rhythm...[t]he rest of his physical examination was also within normal limits...[and] there were no objective findings to suggest that [his] transient complaint of chest pain on that date was cardiac related." Walker Affidavit [73-2] at 6. Based on the physical examination, Dr. Walker believed White's "subjective complaints of dizziness and chest pain were due to anxiety." *Id*.

Dr. Walker also saw the Plaintiff three times for regularly scheduled chronic care evaluations of his cardiac condition.[8] On each of these visits, Dr. Walker concluded that White's cardiac condition was stable and that he had not experienced a change in his condition warranting an evaluation by an outside cardiologist. *Id*. at 6-8.

Dr. Webb treated the Plaintiff from July 12, 2006 to January 29, 2009. During that period, Dr. Webb saw White ten times, three of which were regularly scheduled chronic care evaluations of his cardiac condition and none of which was in response to a sick call request concerning his heart problems.[9] Webb Affidavit [73-3] at 2. On each of the regular chronic care evaluations, Dr. Webb found that White's condition was stable and that he had not experienced a change in his condition which warranted evaluation by a cardiologist outside CMCF. *Id.* at 6-7. Dr. Webb states that White never expressed any complaints concerning chest pain or heart problems during the time she treated him. *See id*. at 3-7.

---

[8]The dates of the evaluations were February 10, 2006; August 22, 2006; and December 17, 2007. *Id.*

[9]The regular examinations were on December 13, 2006; June 21, 2007; and June 12, 2008. Webb Affidavit [73-3] at 6. The other times Dr. Webb saw White for reasons unrelated to his heart problems were on July 12, 2006; March 7, 2008; July 3, 2008; August 11, 2008; October 22, 2008; and January 29, 2009. *Id*. at 3.

8

The Plaintiff had a heart attack[10] on April 16, 2009, which was after he stopped seeing Drs. Walker and Webb. From January 26, 2010 to November 19, 2010, White was treated by Dr. Thomas for chest pains, heart problems, and other medical ailments. Thomas Affidavit [73-4] at 3-8. Dr. Thomas prescribed medications, ordered medical procedures,[11] and performed physical examinations on the Plaintiff. *Id*. During the time Dr. Thomas treated White, Dr. Payment performed a stress test on him. *Id*. at 4. Based on the results of that test, Dr. Payment scheduled a heart catheterization, which ultimately revealed that two grafts were occluded. The Plaintiff asserts that Dr. Thomas, not Dr. Payment, should have discovered the occluded grafts since she had been treating him after the surgery.

The record in this case establishes that Drs. Walker, Webb, and Thomas did not refuse to treat the Plaintiff, ignore his complaints, or intentionally treat him incorrectly. There is no evidence showing that the doctors knew White faced a substantial risk of harm or that they failed to take reasonable steps to prevent the risk of harm. Drs. Walker, Webb, and Thomas saw the Plaintiff for regular cardiac evaluations and in response to sick call requests. The record does not establish that any of these Defendants was deliberately indifferent to White's medical needs. To the contrary, the record shows that they regularly treated White.

White simply argues that, in light of his cardiac history, the doctors should have known

---

[10]On April 16, 2009, White was evaluated by Dr. Tanqueer Yousuf at Central Mississippi Medical Center. Dr. Yousef's diagnosed White with acute non-ST elevation myocardial infarction, with new onset of atrial fibrillation. Doc. [75-1] at 119; Thomas Affidavit [73-4] at 3.

[11]For example, on January 26, 2010, Dr. Thomas ordered a Troponin Level and EKG to evaluate White's complaints of pain. *Id* at 4. The results from these tests were normal. *Id*. On August 2, 1010, Dr. Thomas ordered for White to be given a wheelchair and that he receive a lay in tray for meals for one month. *Id*. at 6.

9

he would have suffered a heart attack. Based on the evidence in the record, the Plaintiff cannot maintain such a claim against Drs. Walker, Webb, and Thomas for deliberate indifference. Summary judgment should be granted as to these Defendants.

c.     Wexford Health Sources, Inc.

White's only claim against Wexford Health Sources is based on vicarious liability. However, "[s]ection 1983 does not create supervisory or *respondeat superior* liability." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002); *see also Powell v. Shopco Laurel Co.,* 678 F.2d 504, 505-506 (4th Cir. 1982) (finding that the plaintiff could not recover against a private state-employed company under § 1983 based on *respondeat superior*). Therefore, Wexford cannot be held vicariously liable for the actions of its employees.

Further, Wexford is not vicariously liable because the Court has already determined that there was no constitutional violation. Assuming the Plaintiff's rights had been violated, Wexford would still not be liable because it was not personally involved the violation. *See Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir. 1982) (finding that the plaintiff could not recover from the private state-employed company defendant under § 1983 based on *respondeat superior*); *see also Mouline v. City of Live Oak, Texas,* 977 F.2d 924, 929 (5th Cir. 1992) (discussing liability of municipalities for actions of subordinates). Therefore, summary judgment should be granted in favor of Wexford.

d.     Dr. Kentrell Liddell

Dr. Liddell was the Chief Medical Officer for the MDOC Office of Medical Compliance until she was replaced by Dr. Gloria Perry in June 2008. *See* Perry Affidavit [78-1] at 1. The Plaintiff alleges that Dr. Liddell is responsible for him not being treated by an outside

cardiologist for heart problems. White never had any contact with Dr. Liddell and is suing her solely because she was Chief Medical Officer for MDOC at the times alleged in the complaint. Although White has not so specified, the Court will assume he is suing Dr. Liddell in her individual as well as official capacities.

Any claim against Dr. Liddell in her official capacity is barred because Dr. Liddell, as a state official, is entitled to sovereign immunity under the Eleventh Amendment. A lawsuit "against a state official that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed. 2d 67 (1984). The Plaintiff's claim against Dr. Liddell is essentially a claim against the State of Mississippi. A lawsuit "against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed. 2d 45 (1989). "[A]n unconsenting State is immune from suits brought in federal court by her own citizens as well as by the citizens of another state." *Pennhurst*, 465 U.S. at 100.

Section 1983 does not waive a state's sovereign immunity. *Aguilar, et al. v. Texas Dept. of Criminal Justice, et al.,* 160 F.3d 1052, 1054 (5th Cir. 1998). Because Mississippi has not consented to suit in this Court or otherwise waived its immunity, neither it nor Dr. Liddell, in her official capacity, can be held liable for money damages. *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) (stating that the Eleventh Amendment bars claims for money damages asserted against prison officials in their official capacities).

In addition, Dr. Liddell is entitled to qualified immunity to the extent the Plaintiff asserts a claim against her in her individual capacity. Under § 1983, a state official acting "within the

scope of [his or her] discretionary authority" is entitled to qualified immunity. *Cronen v. Texas Dept. Human Svcs.*, 977 F.2d 934, 939 (5th Cir. 1992). The doctrine of qualified immunity holds "public officials accountable when they exercise power irresponsibly and…[protects them] from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In determining whether an official is entitled to qualified immunity, the court must decide whether the facts alleged by the plaintiff show that the defendant official violated a constitutional right and whether that right was clearly established at the time of the official's alleged misconduct. *Id*. at 231-232. If a state official pleads "qualified immunity," the court must enter a judgment in favor of the official unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Dr. Liddell is entitled to qualified immunity because the Plaintiff did not suffer a constitutional deprivation. The Defendant doctors who treated White at the times alleged in this lawsuit were not deliberately indifferent to his serious medical needs. The doctors decided, based on White's cardiac condition, that he did not need to be treated by an outside physician.

Medical personnel at MDOC facilities may make requests for inmates to be seen by outside physicians. Perry Affidavit [78-1] at 1. As Chief Medical Officer, Dr. Liddell was responsible for reviewing and approving or denying such requests. *Id*. Dr. Liddell did not treat White or determine whether he needed to be seen by an outside cardiologist; she only approved or denied requests which had been made by medical personnel.

Since no medical personnel requested for White to be treated by an outside physician, Dr.

Liddell never had the opportunity to review, approve, or deny any such request for the Plaintiff. Therefore, she could not have been ultimately responsible for White not receiving outside physician treatment and also, could not have been deliberately indifferent to his medical needs. As such, the claim against Dr. Liddell in her individual capacity fails based on qualified immunity. Assuming qualified immunity did not apply, Dr. Liddell would still be entitled to summary judgment because the Plaintiff has not shown that she was deliberately indifferent.

e. Commissioner Christopher Epps

The last Defendant in this lawsuit is MDOC Commissioner Christopher Epps. White sues Epps in his official capacity. At the *Spears* hearing, White testified that he never had any discussions with Commissioner Epps, but that he filed a grievance with Epps through the Administrative Remedy Program concerning his health issues. White claims that Epps did not "do anything" about his health problems, but that the Commissioner stated he was referring White's medical concerns to the MDOC doctors. *See* Transcript [73-5] at 31. For this reason, White claims that Commissioner Epps was deliberately indifferent to his medical needs.

Under 28 U.S.C. § 1915A(b)(1), the Court may dismiss any portion of a *pro se* prisoner's complaint that is "frivolous, malicious, or fails to state a claim upon which relief may be granted." Having reviewed the complaint and record evidence, the Court finds that the Plaintiff's claim against Commissioner Epps is frivolous. White does not allege any facts to demonstrate how Commissioner Epps was deliberately indifferent to his medical needs. Likewise, the Plaintiff has failed to prove that Commissioner Epps affirmatively participated in any constitutional deprivation or implemented an unconstitutional policy. *See Brown v. Callahan,* 623 F.3d 249, 253 (2010) (stating that supervisory officials can only be held liable for

their own unconstitutional conduct). Accordingly, the claim should be dismissed as frivolous pursuant to 28 U.S.C. § 1915A(b).

## RECOMMENDATION

Based on the foregoing analysis, the undersigned recommends that the Defendants' motions for judgment on the pleadings [61] and for summary judgment [73][78] be granted and that the claims against Commissioner Christopher Epps be dismissed pursuant to 28 U.S.C. § 1915A(b).

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules and 28 U.S.C. § 636(b)(1), any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendation, with a copy to the judge, the magistrate judge and the opposing party. The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this court with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected. *Starns v. Andrews*, 524 F.3d 612, 617 (5th Cir. 2008).

THIS, the 11th day of February, 2013.

/s/MICHAEL T. PARKER  
UNITED STATES MAGISTRATE JUDGE